

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 1:23-CR-112 (TSE) |
| CHEERISH NOEL TAYLOR, | |
| *Defendant*. | |

## STATEMENT OF FACTS

The United States and the defendant, Cheerish Noel Taylor (hereinafter, "the defendant"), agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.  Beginning at least in and around January of 2021, and continuing thereafter up to and including May of 2023, the exact dates being unknown, in Manassas, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant CHEERISH NOEL TAYLOR did knowingly and intentionally combine, conspire, confederate, and agree with ROBERT JAMES FISCHER and others, both known and unknown, to knowingly and intentionally distribute:

    a.  a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C);

    b.  a mixture and substance containing a detectable amount of N-(4-fluorophenyl)-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide, commonly referred to as para-fluorofentanyl, an analogue of fentanyl and a Schedule I controlled substance, in

1

violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C); and

    c. fifty grams or more of methamphetamine, a Schedule II controlled substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).

All in violation of Title 21, United States Code, Section 846.

    2. During the course of and in furtherance of the conspiracy, the defendant personally distributed, or it was reasonably foreseeable to her that her co-conspirators distributed, at least 3,000 KG but less than 10,000 KG of converted drug weight as defined by Section 2D1.1 of the United States Sentencing Commission Guidelines Manual.

    3. It was part of the conspiracy that the defendant and FISCHER created vendor pages on the darknet, posted listings for controlled substances therein, processed orders placed on their darknet vendor pages, packaged controlled substances using methods designed to evade law enforcement detection, and shipped packages containing controlled substances to customers nationwide—including into the Eastern District of Virginia—via the U.S. Postal Service. In exchange, the defendant and FISCHER typically received payment from customers in the form of cryptocurrency.

    4. The defendant and FISCHER used different monikers, or usernames, on the darknet including, but not limited to, SafeServe, Safeserve_1, and Sky_HIGH. FISCHER and TAYLOR created "vendor pages" on the darknet utilizing these monikers on multiple darknet markets including ASAP Market, ToRReZ, White House, and Dark0de. Both FISCHER and TAYLOR were involved in the creation of the vendor pages that they utilized on the darknet.

    a. Beginning in or around January 2021, FISCHER was in electronic communication with a co-conspirator (hereinafter "CC-1") regarding security mechanisms

2

necessary to begin distributing over the darknet, including the use of PGP keys for encrypted messaging.

b. In or around March 2021, CC-1 sent TAYLOR an instructional video relating to the creation of vendor pages on darknet markets. Later, on or about March 20, 2021, TAYLOR told CC-1 via text message "I wrote out our lil vendor profile today...I think its got potential. You'll appreciate the 1st line...High there...yep, you just clicked your new favorite vendor! Haha." "High there, yep you just clicked your new favorite online vendor" was the introductory line on the Safeserve ToRReZ vendor page.

c. In or around February 2022, after the Dark0de market that TAYLOR and FISCHER were utilizing unexpectedly was no longer operational, FISCHER stated to CC-1 via electronic message that he was "out 4 grand" of funds that were in escrow while pending controlled substance orders on that marketplace finalized. FISCHER later that day met with CC-1 to create the Safeserve vendor page on ASAP Market.

5. On the vendor pages created and operated by FISCHER and TAYLOR, they advertised and sold heroin; methamphetamine; counterfeit pills laced with para-fluorofentanyl, an analogue of fentanyl; cocaine, Xanax, Adderall, and suboxone.

a. For example, in their vendor profile on the Dark0de marketplace, the defendant and FISCHER advertised that "we test everything before we send out." Accordingly, the defendant and FISCHER advertised their heroin as "heroin black tar fent-free!" and "black tar heroin...NO fentanyl, all batches tested."

b. During the course of the conspiracy, the defendant and FISCHER also purported to sell legitimately manufactured pharmaceutical drugs. For example, one of their ads

3

for Xanax stated that it was "straight out of pharmacy…. ALWAYS REAL…NEVER Pressed! Limited Amount, Only have a certain amount ava each month.".

c. On ASAP market, TAYLOR and FISCHER advertised and sold quantities of what they advertised as "pharmaceutical adderal" for over $13 USD per pill, noting "grab em while you can will sell out quick esp with nation wide shortage."

d. On multiple darknet marketplaces the defendant and FISCHER marketed light blue pills bearing the imprints "M" on one side, and "30" on the other. They marketed these pills as "blues" and "pressed m30s" in product listings. These pills were designed to resemble legitimately manufactured pharmaceutical oxycodone, which frequently bears the imprint "M" for the manufacturer, Mallinckrodt pharmaceuticals, and the "30" indicating 30 milligrams. The defendant marketed these pills knowing that they did not contain oxycodone, and instead contained fentanyl or a fentanyl analogue. Within the product description for the purported "blues," the defendant's darknet vendor page on ASAP Market stated that "These are not reg M30s they are PRESSED and are very strong…seasoned users only please." In another listing for the purported "blues," the defendant and FISCHER advertised "small fine print: these are NOT from a pharmacy they are PRESSED from Mexico. Seasoned users Only because these are strong AF not for those who are freshly using."

6.      In order to avoid law enforcement detection, the defendant and FISCHER packaged their controlled substances along with innocuous items, also known as "stealth," before placing them in the mail. The "stealth" used by the defendant and FISCHER typically included materials

of the kind that could be purchased at a dollar store, including stationary, index cards, children's stickers, dinosaur figurines, beads, birthday cards, pencils, and seasonal gifts items (such as Valentine's stickers, Easter gift bags, and Halloween toys). The controlled substances were at times hidden inside of toy packaging. The defendant and FISCHER further used fake names and return addresses on the packages they shipped. FISCHER utilized an alias "Zachary Brown," during the course of the conspiracy in order to evade arrest on a warrant in relation to a probation violation. The defendant and FISCHER however informed potential customers to use their real name when receiving packages at their homes "because it should blend in with the rest of your mail."

7.      The defendant and FISCHER's vendor profiles on the dark net reflected records of certain sales made through the vendor pages. Throughout the conspiracy, ASAP market, ToRReZ, and Dark0de markets advertised the total number of sales the defendant and FISCHER's accounts had made to date, regardless of the product. In addition to these tallies, for certain sales, customers left reviews. Customers are not required to leave a review, and the number of sales surpassed the number of reviews on each market used by the conspirators. The sales figures on the defendant and FISCHER's vendor pages reflected that they completed over 1,100 sales of controlled substances using the White House, ToRReZ, Dark0de, and ASAP marketplaces. Reviews submitted by customers for approximately 233 of these sales revealed that the defendant and FISCHER sold at least 400 grams of heroin, 300 grams of pure methamphetamine, 540 counterfeit pills containing fentanyl or a fentanyl analogue, 210 strips of Suboxone, 9.5 grams of cocaine, and 100 Xanax pills.

8.      Between November 2021 and September 2022, law enforcement conducted controlled purchases from the defendant and FISCHER's jointly operated vendor pages. The

substances ordered, prices, and lab analyses of the products received are summarized below. Methamphetamine quantities reflected in the below chart indicate an amount of pure substance detected within a mixture and substance containing methamphetamine hydrochloride. The purity levels of the methamphetamine received by the FBI through the below controlled purchases ranged from 94% to 100% pure methamphetamine.

| Date Ordered | Marketplace | Substance Advertised | Quantity Ordered | Price (USD) | DEA Laboratory Confirmation |
|---|---|---|---|---|---|
| 11/2/2021 | ToRRez | "Meth 3.5 grams" | 3.5 grams | $80 | 3.52 grams Methamphetamine Hydrochloride |
| 01/13/2022 | Dark0de | "5 free..pressed m30..blues… x25" | 25 pills | $200 | 3.615 grams para-Fluorofentanyl |
| 2/3/2022 | Dark0de | "good quality meth ½ oz (free shipping)" | 14 grams | $311 | 14.12 grams Methamphetamine Hydrochloride |
| 3/9/2022 | ASAP | "Heroin Black Tar Fent – Free! 3 Grams" | 3 grams | $200 | 2.85 grams Heroin |
| 4/4/2022 | ASAP | "Methamphetamine Half Ounce" | 14 grams | $325 | 15 grams Methamphetamine Hydrochloride |
| 5/10/2022 | ASAP | "Crystal Methamphetamine" | 7 grams | $190 | 9.02 grams Methamphetamine Hydrochloride |
| 9/23/2022 | ASAP | "Meth – 7 Gs – FREE Shipping" | 7 grams | $150 | 7.98 grams Methamphetamine Hydrochloride |
| 1/31/2023 | ASAP | "Ball of METH SALE – 3.5 grams - $50" | 3.5 grams | $50 | 3.3615 grams Methamphetamine Hydrochloride |

9.     TAYLOR's fingerprints were identified on the packaging of one of the packages containing controlled substances that was sent to the FBI in the course of the investigation.

10.     In addition to selling controlled substances over darknet markets, TAYLOR and FISCHER utilized internet-based electronic communications services in order to identify and

contact drug customers residing locally in the Phoenix, Arizona area. TAYLOR and FISCHER sold controlled substances to customers in-person, including out of their shared residence in Phoenix, Arizona.

    a. For example, in or around November 2021 FISCHER sold approximately 4 ounces of methamphetamine to CC-1.

    b. In or around December 2021, TAYLOR negotiated a sale of 1,000 counterfeit oxycodone pills containing fentanyl or a fentanyl analogue to CC-1 for $3,500. Specifically, CC-1 stated via text message "Hey I've been trying to text Bobby [FISCHER] but I haven't heard back. I was going to see if I could get a boat of blueberry's when I get back in town tomorrow." TAYLOR responded stating, among other things, "A boat as in 1000?....Hey so I finally got to catch up with B [FISCHER]…just want to make sure we're on the same page…Picking up a [boat emoji] would be $3.50 x1,000."

    c. CC-1 on multiple occasions travelled to TAYLOR and FISCHER's shared residence to purchase controlled substances.

11.    Both TAYLOR and FISCHER possessed dangerous weapons in relation to their drug trafficking.

    a. For example, in or around January 2022, FISCHER sent a message to a CC-1 stating "…if your back in town you should help me build my ar 15 I have all the pieces for it it's just touch to put it together but it shouldn't be too hart I have done it before but it's been awhile."

    b. TAYLOR possessed a Glock 43 handgun during the course of the conspiracy.

7

c.   During the conspiracy, TAYLOR and FISCHER further travelled to a shooting range with CC-1.

d.   Ammunition was seized from TAYLOR and FISCHER's shared residence at the time of their arrest in June 2023.

e.   During the conspiracy, both TAYLOR and FISCHER had prior felony convictions and were prohibited from owning firearms.

12.   This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States.  It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

1.   The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date:   August 25, 2023            By:   _____

Heather D. Call
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Cheerish Noel Taylor, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Cheerish Noel Taylor

I am Andrew Stewart, defendant's attorney.  I have carefully reviewed the above Statement of Facts with her.  To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Andrew M. Stewart, Esquire
Counsel for Cheerish Noel Taylor

9